**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HURON CONSULTING GROUP INC. and,** | ) | |
| **CONSILIO LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No.  17 C 6042** |
| | ) | |
| **RONALD GRUNER, individually,** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

This is a dispute about the scope of an arbitration agreement.  Defendant Ronald Gruner filed a demand for arbitration of two claims against Plaintiffs Huron Consulting Group, Inc. and Consilio, LLC.  Plaintiffs contend that they agreed to arbitrate one of these claims, but not the other, and have brought this action seeking declaratory relief and an order staying arbitration of the claim they allege to be beyond the scope of their agreement with Defendant.  Gruner has moved to dismiss for improper venue or, in the alternative, for lack of subject matter jurisdiction, arguing that the parties intended for the arbitrator, rather than a court, to decide whether certain claims are arbitrable under the agreement.  Because Gruner has not presented the requisite clear and unmistakable evidence of this purported intent, the motion is denied.  Moreover, because the court concludes as a matter of law that the parties did not agree to arbitrate the claim in Gruner's second count, the court directs him to show cause within 21 days why the court should not stay arbitration of that claim.

**BACKGROUND**

Defendant Ronald Gruner, a resident of Naples, Florida, is the former CEO of Sky Analytics, Inc., a legal analytics and technology company.  (Not. of Removal [1], at ¶ 4; Compl. [1-1], at ¶ 1.)  Plaintiff Huron Consulting Group acquired Sky on December 30, 2014.  (Compl.

¶ 7.)  A year later, Huron sold a portion of its business—including Sky—to Plaintiff Consilio.  (*Id.* at ¶ 11.)  The court is uncertain that Huron is a proper party to this lawsuit at all, as Gruner suggests that Consilio stepped into its position with regard to the agreements relevant to this case.  Nevertheless, Gruner has not contested Huron's standing.  Huron is a Delaware corporation with its principal place of business in Chicago, Illinois.  (Not. of Removal ¶ 4.)  Plaintiff Consilio is a Virginia limited liability company with its principal office in Washington, DC, whose sole member is Consilio, Inc., a Delaware corporation with its principal place of business in Delaware.  (*Id.* at ¶¶ 5-6; Gruner's Response Regarding Diversity [17].)

The terms of Huron's purchase of Sky were documented in a Stock Purchase Agreement (SPA) dated December 30, 2014.  (Compl. ¶ 8.)  Huron agreed to pay Sky's shareholders a base purchase price of $9,000,000, plus two additional "earnout" payments in the event that Sky generated revenues in excess of a designated amount.  (Stock Purchase Agreement [hereafter "SPA"], at §§ 1.2, 1.6, Ex. 1 to Compl.)  Section 1.6 of the SPA established the method for calculating these earnout payments and procedures for resolving certain disputes between the parties.  Subsection 1.6(c), titled "Disputes Regarding Net Revenue; Earnout Amounts," states, in relevant part, that disputes concerning the "earnout" calculation will be resolved by an Independent Auditor:

> Following receipt of any Earnout Report, the Representative [of Sky's stockholders] will be afforded a period of thirty (30) days to review such Earnout Report and related calculation of the applicable Earnout Amount (the "Earnout Review Period").  The Representative shall be deemed to have accepted the Earnout Report and [Huron's] calculation of the applicable Earnout Amount unless, prior to the expiration of the Earnout Review Period, the Representative shall deliver to [Huron] written notice and a detailed written explanation of those items that are in dispute. . . . Within a further period of thirty (30) days from the end of the Earnout Review Period, the parties will attempt to resolve in good faith any disputed items.  Failing such resolution, the unresolved disputed items will be referred for final binding resolution to the Independent Auditor.

(SPA § 1.6(c).)  Another section of the agreement, titled "Jurisdiction: Waiver of Jury Trial," states that the parties

irrevocably submit to the exclusive jurisdiction of the United States District Court for the Northern District of Illinois (or, if subject matter jurisdiction in that court is not available, in the state courts of Illinois located in Cook County, Illinois) over any dispute arising out of or relating to this Agreement, any Ancillary Agreement or any agreement or instrument contemplated hereby or thereby or entered into in connection herewith or therewith or any of the transactions contemplated hereby or thereby.

(*Id.* at § 12.9.)

On January 6, 2015, Huron entered into a separate "Master Subcontractor Agreement" (MSA) with Gruner. This agreement outlined terms under which Gruner would provide Huron with "Product Vision, Strategy, and Development," "Marketing and Sales Support," "Organizational Development," and "Performance Optimization." (MSA Statement of Work, Ex. 2 to Compl.) Unlike the SPA, the MSA did not include an arbitration clause. (*Id.*) It did, however, include a choice-of-law provision stating that Illinois law would govern the rights and duties of the parties, and a forum-selection clause stating that "jurisdiction over any dispute arising in connection with this Agreement will be vested exclusively in the State or, if appropriate, federal courts located in Cook County." (MSA ¶ 16.)

The First Earnout Measurement Period began on April 1, 2015, and ended on March 31, 2016. (SPA § 11.1.) On December 31, 2015, Huron sold the legal portion of its business, including Sky, to Consilio, Inc., the parent corporation of Plaintiff Consilio, LLC. (Compl. ¶ 11.) On September 19, 2016, Plaintiff Consilio informed Sky's stockholders, including Gruner, that Sky had not produced sufficient revenue during the First Earnout Measurement Period to trigger an earnout payment. (Compl. ¶ 12; Letter of Oct. 14, 2016, Ex. 3 to Compl.) Gruner responded with a letter to Consilio and Huron, dated October 14, 2016, in which he identified himself as the "Representative" of Sky's stockholders. (Letter of Oct. 14, 2016, Ex. 3 to Compl.) In this letter, Gruner blamed Huron and Consilio for Sky's "inability to exceed the First Net Revenue Threshold" and suggested that the companies had failed "to fulfill their respective contractual obligations under the Purchase Agreement and to meet their implied covenant of good faith and

fair dealing." (*Id.*) Gruner's MSA and "Statement of Work," Gruner explained, had "amplified the mutual expectations and responsibilities of the parties aimed at driving to successful achievement of the Net Revenue targets." (*Id.*) Huron and Consilio's "fail[ure] to meet those expectations . . . despite repeated attempts on [Gruner's] part, shut the door on the strategic and logistical initiatives required – and expressly defined in the SOW [Statement of Work] – to enable Sky to achieve the Earnout targets." (*Id.*) Gruner attached to the letter an invoice for "consulting services" for which Huron allegedly owed him $120,000. (*Id.*)

According to the Complaint, the parties tried and failed to resolve the various issues identified in this letter on their own. (Compl. ¶ 14.) On January 31, 2017, James D. Dasso, identifying himself as an attorney for both "Sky Analytics, Inc. and the stockholders of Sky Analytics, Inc.," informed Huron and Consilio that his clients would be "referring the unresolved disputed items to an Independent Auditor" pursuant to Section 1.6(c) of the SPA. (Letter of Jan. 31, 2017, Ex. 4 to Compl.) The letter proposed that Deloitte serve as Independent Auditor. (*Id.*) Unlike Gruner's October 14 letter, Dasso's January 31 letter made no mention of Gruner's subcontractor agreement or the invoice Gruner had attached to the October 14 letter. (*Id.*)

The parties eventually agreed to bring certain disputed issues to JAMS, a private mediation and arbitration service, rather than an "Independent Auditor" as provided in the SPA. (Compl. ¶ 16.) On March 20, 2017, Dasso—this time identifying himself as the representative of "the former shareholders of Sky Analytics, Inc."—sent e-mails memorializing this new agreement to Huron's general counsel Diane Ratekin and Consilio's general counsel Mike Flanagan. (E-mail thread of March 20, 2017, Ex. 6 to Compl.) These e-mails proposed that the parties agree "to have all disputes regarding Net Revenue and the Earnout Amounts (as those terms are used in Section 1.6 of the Purchase Agreement) proceed before JAMS, rather than before an Independent Auditor as provided in the Purchase Agreement." (*Id.*) The e-mails also explained that "[u]nder JAMS Rule 5(a)(iii), a written confirmation of an agreement of all parties to participate in arbitration by JAMS is sufficient to trigger its jurisdiction," and stated that "[o]nce

4

we get written confirmation from Huron and Consilio, we will submit our claims to JAMS to begin the process." (*Id.*)  Later on March 20, Ratekin responded that "I understand this approach is fine with Consilio, and so Huron is also fine with it." (*Id.*)  Flanagan responded "[c]onfirmed," also on March 20. (*Id.*)

Gruner filed a Demand for Arbitration with JAMS on April 7, 2017, ostensibly as the "Representative" of Sky's "former shareholders." (JAMS Form 2, Ex. 6 to Compl.)  Sky itself was not named as a party in this document (nor is Sky named as a party to this suit).  Gruner's Demand for Arbitration included two counts.  The first alleged that Huron and Consilio breached their implied duty of good faith and fair dealing under the SPA by, *inter alia*, "[f]ailing to maintain key, pre-existing leadership," "[f]ailing to support Sky after acquisition," and "[f]ailing to retain Gruner as a subcontractor." (Demand for Arbitration ¶¶ 25-29.)  The second count alleged that Huron and Consilio breached the MSA by "[f]ailing to retain Gruner as a subcontractor," "[f]ailing to provide written notice of termination," and "[f]ailing to pay Gruner fees for subcontractor services he provided." (*Id.* at ¶¶ 30-34.)  The Demand for Arbitration identified the arbitration clause in Section 1.6(c) of the SPA, the January 31, 2017 notice of referral, and the agreement in the March 20, 2017 e-mails as the basis for JAMS' jurisdiction. (*Id.* at ¶¶ 7-9.)

On June 8, 2017, JAMS Arbitrator Stephen A. Schiller issued a scheduling order in the parties' case. (Scheduling Order #1, Ex. 1 to Def.'s Reply in Supp. of Mot. to Dismiss [hereafter "Def's Reply") [15].)  This order stated, among other things, that "[p]ursuant to the agreement of the parties, this Arbitration will be conducted under JAMS Comprehensive Rules." (*Id.*)  The letter also explained that its purpose was "to memorialize certain agreements reached by the parties and rulings made by the Arbitrator at a 'Preliminary conference' pursuant to JAMS Comprehensive Rules (Rule 16) and conducted by way of teleconference on June 8, 2017." (*Id.*)

Huron and Consilio filed a Complaint in the Circuit Court of Cook County on June 23, 2017, naming Gruner in his individual capacity as Defendant and seeking a declaration that the

claim in the second count of the Demand for Arbitration is "outside the scope of the parties' agreement to arbitrate." (Compl. ¶ 1.) Plaintiffs also sought an order staying the arbitration as to the second count pursuant to 710 ILCS 5/2(b). (*Id.*) Gruner removed the case to this court on August 18, 2017, and now moves to dismiss under Rules 12(b)(1) and 12(b)(3) of the Federal Rules of Civil Procedure. (Mot. to Dismiss [10].)

**DISCUSSION**

## I. Procedural Posture

The dispute between Gruner and Huron/Consilio raises two distinct questions: (1) whether the parties agreed to arbitrate claims alleging breach of the MSA; and (2) whether this question of arbitrability must itself be decided by the arbitrator. Gruner's Motion asks the court to resolve only this second question. (*See* Mot. to Dismiss 1; Def.'s Reply 7.) His briefs, however, contain arguments in support of his position on the first question, as well. Plaintiffs suggest that he should have moved to compel arbitration under Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, rather than moving to dismiss under Rule 12(b), though they request that the court address Gruner's substantive arguments "regardless of how it treats the Motion." (Pls.' Resp. to Mot. to Dismiss (hereafter "Pls.' Resp.") [12], at 6 n.3.)

As an initial matter, the court notes that it would be improper to dismiss this case for lack of subject-matter jurisdiction under Rule 12(b)(1). *See Johnson v. Orkin*, *LLC*, 556 F. App'x 543, 544 (7th Cir. 2014) ("An arbitration agreement . . . can be waived by the parties, so the effect of such an agreement on a lawsuit is not jurisdictional."); *Williams-Bell v. Perry Johnson Registrars, Inc.*, No 14-cv-1002, 2015 WL 6741819, at *2-3 (N.D. Ill. Jan. 8, 2015) (Gottschall, J.) ("*Johnson* teaches that when faced with a forum selection clause . . . that requires the parties to arbitrate their disputes before the AAA, a court should not dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).").

The decision Defendant cites in support of his Rule 12(b)(3) motion to dismiss for improper venue, meanwhile, states that dismissal under Rule 12(b)(3) is proper "when the

arbitration clause requires arbitration outside the confines of the district court's district." *Faulkenberg v. CB Tax Franchise Systems, LP*, 637 F.3d 801, 808 (7th Cir. 2011); *see also Continental Casualty Co. v. American Nat. Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005). That is not the case here, where the applicable arbitration clauses do not specify any location (and where the agreements' additional forum-selection clauses specify this district as a proper venue for litigation outside the scope of the arbitration clauses). (*See* SPA §§ 1.6, 12.9; MSA ¶ 16; E-mails of March 20, 2017.)

For these reasons, and because Gruner has presented arguments in his briefs that go to the underlying question of whether the second claim in his Demand for Arbitration is arbitrable, the court will treat the motion as one to compel arbitration under the Federal Arbitration Act. *Cf. Continental Casualty Co.*, 417 F.3d at 732 n.7. The court considers the two questions raised by Gruner's motion—that is, whether the parties agreed to arbitrate claims alleging breach of the MSA, and whether this question of arbitrability must itself be decided by the arbitrator—in reverse order, as a decision in Gruner's favor on the second question would obviate the need to decide the first.

## II.    The parties did not agree to arbitrate the question of arbitrability.

Gruner believes that an arbitrator, rather than this court, must decide whether the second claim in his Demand for Arbitration is arbitrable. He first argues that the "strong federal policy in favor of arbitration" requires this court to *presume* that the parties agreed to arbitrate this question of arbitrability. (Mot. to Dismiss 3.) Gruner is correct that the Federal Arbitration Act establishes a "liberal federal policy favoring arbitration." *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983)). "As a general policy matter, federal courts favor arbitration." *Wisconsin Local Gov't Property Ins. Fund v. Lexington Ins. Co.*, 840 F.3d 411, 415 (7th Cir. 2016). But Gruner is incorrect that this liberal federal policy creates a legal presumption that, where parties

agree to arbitrate some disputes but not others, they intend to have the arbitrator decide in the first instance which disputes are arbitrable and which are not.

In fact, the law requires the opposite presumption. A long line of U.S. Supreme Court decisions holds that "[c]ourts should not assume that the parties [to a contract] agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Technologies, Inc. v. Commn'cns Workers*, 475 U.S. 643, 649 (1986)). This heightened evidentiary requirement is "an important qualification" to the default rule that courts should interpret arbitration clauses according to "ordinary state-law principles that govern the formation of contracts." *Id.* It rests on the premise that a contracting party could reasonably overlook the "rather arcane" question of whether an arbitrator or a court should decide questions of arbitrability. *Id.* at 945. The Supreme Court has repeatedly held that this and other "gateway" matters are presumptively "for the court" to decide. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Even in cases where the Court has narrowed the definition of a gateway matter, it has reiterated that courts must apply a "heightened standard" when considering the parties' "manifestations of intent" to "arbitrate arbitrability." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010); *see also BG Group, PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206-07 (2014) (dispute over the timing of arbitration was "purely procedural" and thus not the type of "dispute[] about 'arbitrability'" to which presumption in favor of judicial determination would attach). As the Seventh Circuit recently reaffirmed, "[c]ourts, not arbitrators, are charged with deciding 'gateway matters, such as whether the parties have a valid arbitration agreement at all, *or whether a concededly binding arbitration clause applies to a certain type of controversy.*'" *Wisconsin Local Gov't Property Ins. Fund v. Lexington Ins. Co.*, 840 F.3d 411, 414-15 (7th Cir. 2016) (quoting *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 453 (2003)).

Few, if any, of Defendant's cases support his contention that this longstanding interpretive rule has been replaced by its opposite—that is, by a presumption that "disputes about 'arbitrability'" should be decided by arbitrators in the absence of clear evidence to the contrary. Gruner first points to the Seventh Circuit's decision in *International Brotherhood of Electrical Workers, Local 21 v. Illinois Bell Telephone Co.*, which states that "[w]hen resolving arbitrability disputes, a court must bear in mind the liberal federal policy in favor of arbitration agreements." 491 F.3d 685, 687 (7th Cir. 2007). But this statement does not mean what Gruner suggests it does—i.e., that the "liberal federal policy in favor of arbitration agreements" requires the court to presume that parties intend to have arbitrators decide disputes about the scope of arbitration agreements. Rather, it means that a court must apply a presumption of arbitrability *when the court itself decides whether the parties agreed to arbitrate a particular claim*. The sentence immediately preceding the one Gruner quotes confirms this: "[u]nless the parties clearly provide otherwise, the question of arbitrability is properly decided by a court, not the arbitrator." *Id.*

Gruner makes the same mistake with regard to *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333 (2011), *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983), *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147 (7th Cir. 2016), *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027 (7th Cir. 2012), *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907 (7th Cir. 1999), and *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639 (7th Cir. 1993). Each of these cases recognizes, in one phrasing or another, a "general policy 'favoring arbitration and a liberal federal policy favoring arbitration agreements,'" *Lewis*, 823 F.3d at 1159 (quoting *AT&T Mobility*, 563 U.S. at 346). Some also state that "broad" or "expansive" arbitration clauses "necessarily create a presumption of arbitrability," and that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Kiefer*, 174 F.3d at 909 (quoting *Moses H. Cone*, 460 U.S. at 24-25); *Gore*, 666 F.3d at 1034 (same); *Sweet Dreams*, 1 F.3d at 642 (same).

None of these cases, however, involved a dispute about the "gateway" question of whether an arbitrator or a court should decide whether the parties agreed to arbitrate a particular claim. As a result, none challenge the well-established rule that a "reverse[]" presumption applies to the question of who should decide whether a particular claim is arbitrable. *First Options*, 514 U.S. at 945. As the Supreme Court recently reaffirmed, "courts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about 'arbitrability.'" *BG Group*, 134 S. Ct. at 1206; *see also Wisconsin Local Gov't*, 840 F.3d at 414.

The only case Gruner cites that comes close to supporting his position on this issue is *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 530 N.E.2d 439 (1988). That case involved an employment contract between defendant and his employer, a commodity futures broker. It also involved the Rules of the Chicago Board of Trade (CBOT), of which both parties were members. CBOT Rule 600.00 stated, in relevant part, that "[a]ny controversy between parties who are members which arises out of the Exchange business of such parties shall, at the request of any such party, be submitted to arbitration in accordance with regulations prescribed by the Board." *Id*. at 439. The dispute in *Donaldson* was whether the defendant's claims for compensation, severance pay and unpaid expenses "ar[o]se out of Exchange business," and thus fell within the scope of the arbitration provision in Rule 600.00, or whether they arose from defendant's employment contract alone. *Id.* at 451. But the parties also disputed whether a court or an arbitrator should decide that question in the first place. Reversing the Illinois Appellate Court, the Illinois Supreme Court explained that "when the language of an arbitration clause is broad, and it is unclear whether the subject matter of the dispute falls within the scope of [the] arbitration agreement, the question of substantive arbitrability should initially be decided by the arbitrator." *Id*. at 447-48. Put differently, the court held that a court should presume that the arbitrator determines arbitrability in one specific

circumstance: where an arbitration clause is simultaneously "broad" and it is "unclear" as to whether the dispute in question falls within the scope of that arbitration clause.

Notably, *Donaldson* is premised on an interpretation of the Illinois Uniform Arbitration Act, not federal arbitration law. *Id. at* 449 (noting that the "most important[]" factor in the Court's decision was "the intent of the drafters of the Uniform Arbitration Act"). The Seventh Circuit has advised that "federal arbitration law governs the arbitration provisions in any contract evidencing a transaction in interstate commerce." *Northern Ill. Gas Co. v. Airco Indus. Gases*, 676 F.3d 270, 274-75 (7th Cir. 1982); *see also Zechman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 742 F. Supp. 1359, 1367 n.6 (N.D. Ill. 1990) (noting that *Donaldson* "is predicated on the applicability of the Illinois Uniform Arbitration Act," which is "superseded by the Federal Arbitration Act" in disputes involving transactions in interstate commerce). Gruner's case involves a transaction in interstate commerce—the parties appear to have been residents of different states at the time they entered into at least some of the agreements in question (*cf.* Letter of Oct. 14 and Invoice, Ex. 3 to Compl. (identifying addresses of all parties as of October 2016))—so federal arbitration law applies here.

Even if *Donaldson* were applicable in this case, the court doubts that the parties' arbitration agreement is sufficiently "broad" to trigger the state-law presumption in favor of arbitrating arbitrability. Unlike the arbitration clause in *Donaldson*, which referred to "[a]ny controversy between parties who are members which arises out of the Exchange business of such parties," 530 N.E.2d at 439, the relevant arbitration clause here extends only to "disputes regarding Net Revenue and the Earnout Amounts (as those terms are used in Section 1.6 of the Purchase Agreement)." (E-mail of March 20, 2017.) The phrase "disputes regarding Net Revenue and the Earnout Amounts (as those terms are used in Section 1.6 of the Purchase Agreement)" describes a limited set of disputes. The phrase "controversy . . . which arises out of the Exchange business of such parties," on the other hand, reaches not only controversies about any type of "Exchange business," but also any controversies "arising out of" such

Exchange business.  Defendant here argues that the phrases "arising out of" and "regarding" are equally "broad," (Def.'s Reply 2-3), but even if this is true, it ignores the difference in breadth between the phrases "Exchange business" and "Net Revenue and the Earnout Amounts (as those terms are used in Section 1.6 of the Purchase Agreement)."

The question for this court to decide, therefore, is whether there is "clear and unmistakable" evidence that the parties intended to arbitrate disputes about arbitrability.  *First Options*, 514 U.S. at 944; *Rent-A-Center*, 561 U.S. at 69 n.1.  Gruner points to two matters relevant to the parties' intent: (1) the fact that the parties agreed in the March 20 email to arbitrate before JAMS, and (2) the fact that JAMS' own rules state that "[j]urisdictional and abitrability disputes, including disputes over the formation, existence, validity or scope of the agreement under which Arbitration is sought . . . shall be submitted and ruled on by the Arbitrator."  (Mot. to Dismiss 5-7.)[1]  Gruner argues that "[t]he JAMS rules are incorporated into the agreement" between the parties.  (Def.'s Reply 5.)

Several courts of appeal have held that the incorporation of an arbitrator's rules into an arbitration clause can provide the requisite clear and unmistakable evidence of contracting parties' intent to arbitrate arbitrability—at least in circumstances where the incorporated rules state that the arbitrator will decide disputes about arbitrability.  *See, e.g.*, *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 674-75 (5th Cir. 2012); *T.Co Metals LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 344-45 (2d Cir. 2010); *Fallo v. High-Tech Institute*, 559 F.3d 874, 877-78 (8th Cir. 2009).  In each of these cases, however, the parties' contract expressly provided for arbitration according to the rules of the arbitrator.  In *Brennan*, for example, the parties agreed to "binding arbitration *in accordance with the Rules of the American Arbitration*

---

[1]     The court takes judicial notice of Rule 11(b) of the JAMS Comprehensive Arbitration Rules & Procedures, Effective July 1, 2014.  *See* Fed. R. Evid. 201(b)(2).  These rules can be found at https://www.jamsadr.com/rules-comprehensive-arbitration/ (last visited Jan. 8, 2017).

*Association.*" 796 F.3d at 1128 (emphasis added). Similarly, in *Dempsey* the parties agreed to arbitrate "under the [i]nternational arbitration rules of the American Arbitration Association." 592 F.3d at 334. The same is true of the cases from this district cited by Gruner. *See Info. Sys. Audit & Control Ass'n, Inc. v. TeleCommunication Sys., Inc.*, No. 17-cv-2066, 2017 WL 2720433, at *2 (N.D. Ill. June 23, 2017) (agreement provided for arbitration "in accordance with the Commercial Arbitration Rules of the American Arbitration Association"); *Cequent Performance Prods., Inc. v. Let's Go Aero, Inc.*, No. 14-cv-8457, 2016 WL 4036754, at *6 (N.D. Ill. July 28, 2016) (agreement provided for arbitration "administered by the American Arbitration Association in accordance with the provisions of its Commercial Arbitration Rules").[2]

The March 20 e-mail, by contrast, does not say anything about incorporating JAMS rules, let alone the specific rule relating to disputes about arbitrability and jurisdiction. Nor does any other correspondence in the record mention the JAMS rules or discuss the question of who should decide disputes over arbitrability. Although the JAMS Arbitrator apparently believed that the parties incorporated the JAMS rules into their arbitration agreement—he wrote in a scheduling order that "pursuant to the agreement of the parties this Arbitration will be conducted under JAMS Comprehensive Rules" (Scheduling Order #1, Ex. 1 to Def.'s Reply)—the Arbitrator's conclusory statement is not the kind of clear and unmistakable evidence of the parties' intent that the law requires.

True, the March 20 e-mail does refer to one specific JAMS rule. It states that "[u]nder JAMS Rule 5(a)(iii), a written confirmation of an agreement of all parties to participate in arbitration administered by JAMS is sufficient to trigger its jurisdiction." This reference to a specific JAMS rule could be interpreted as a proposal to conduct the arbitration according to all JAMS rules, including the rule that the arbitrator will decide disputes about arbitrability. When

---

[2] Gruner also points to *Wilson Sporting Goods Co. v. Head Sports, Inc.*, No. 94-cv-4966, 1994 WL 702611 (N.D. Ill. Dec. 14, 1994), but this case, like most others he cites, involved only a dispute about arbitrability. It did not raise the question of whether the dispute about arbitrability was itself arbitrable, as the case now before the court does.

read in context, however, the more appropriate interpretation of this statement is as no more than an acknowledgement that the parties had agreed to arbitration by JAMS—not an implicit proposal to voluntarily adopt all JAMS' boilerplate rules. It seems highly unlikely that a fleeting reference to the procedure for initiating arbitration led Plaintiffs to consider the "rather arcane" question of whether disputes over the scope of the arbitration agreement should be decided by the arbitrator or by a court. *First Options*, 514 U.S. at 944. The Supreme Court imposed a "heightened standard" on claims of intent to "arbitrate arbitrability," *Rent-A-Center*, 561 U.S. at 69 n.1, for precisely this reason.

Gruner contends that it would have been redundant for the parties to designate both the forum for arbitration (i.e., JAMS) *and* the applicability of that forum's rules. Where parties designate a particular forum for arbitration, Gruner suggests, a court should infer that the parties intended for all of that forum's rules to apply. In support of this proposition, Gruner points to *Brown v. Delfre*, 2012 Ill. App. (2d) 111086, 968 N.E.2d 696 (2d Dist. 2012), a case involving a dispute over the enforceability of an arbitration clause in a contract between plaintiff, a former professional football player and his investment advisor. The arbitration clause provided that the parties would submit to binding arbitration "conducted by and according to the securities arbitration rules . . . of the [National Association of Securities Dealers (NASD)]." *Id.* at 699. NASD was succeeded by the Financial Industry Regulatory Authority (FINRA), which subsequently informed the parties that it would not arbitrate disputes among non-members. Plaintiff then challenged the enforceability of the arbitration agreement, arguing that the parties had only agreed to arbitrate in the now-unavailable NASD/FINRA forum, and the trial court agreed, refusing to compel arbitration. The appellate court disagreed; it noted that the parties' contract required the parties to arbitrate in accordance with NASD/FINRA's rules, but did not require that they arbitrate in a NASD/FINRA forum. The arbitration agreement remained enforceable, the court held, explaining that "if the parties contemplated that NASD/FINRA would

be the exclusive arbitral forum, there would be no need to specify that the arbitration must be conducted by NASD/FINRA's rules." *Id.* at 703.

Whatever the merits of this reasoning, the *Brown* decision does not directly support Gruner's argument here: like nearly all the cases Gruner cites, *Brown* involved a dispute about arbitrability, rather than a dispute about the parties' intent (or lack thereof) to arbitrate arbitrability. The court concluded that it was proper to infer from the designation of an arbitral forum the parties' intent to be governed by all that forum's rules. But the court's analysis was not governed by the heightened evidentiary standard that applies to Gruner's claim that he and Plaintiffs agreed to arbitrate the issue of arbitrability. To prevail on this claim, Gruner needed to present clear and unmistakable evidence of the parties' intent to arbitrate arbitrability. The fact that the parties designated an arbitral forum that offers parties the *option* of adopting a rule to this effect is not enough.

## III. Gruner's claim alleging breach of the MSA is not arbitrable.

The court is thus called upon to address the underlying question at the heart of this case: whether the claim in Count II of Gruner's Demand for Arbitration—that is, the claim alleging breach of the MSA—is arbitrable. The "heightened standard" that applies to "gateway" matters, *Rent-A-Center*, 561 U.S at 69 n.1, does not apply here. Indeed, the presumption in favor of judicial determination is "reverse[d]" where the question is "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *First Options*, 514 U.S. at 944-45. In deciding this question, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (quoting *Moses H. Cone*, 460 U.S. at 24-25). But this "general preference" for arbitration still "yields to explicit contrary contractual language." *Wisconsin Local Gov't*, 840 F.3d at 415. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Duthie v. Matria Healthcare, Inc.*, 540 F.3d 533, 536 (7th Cir. 2008) (quoting *Howsam*, 537 U.S. at 83.)

The arbitration clause Gruner relies on is located in the parties' e-mail thread of March 20, 2017. It states, in relevant part, that the parties agree "to have all disputes regarding Net Revenue and the Earnout Amounts (as those terms are used in Section 1.6 of the Purchase Agreement) proceed before JAMS, rather than before an Independent Auditor as provided in the Purchase Agreement." (E-mail of March 20, 2017.) Neither the arbitration clause itself nor the e-mail chain in which it was included refer to the MSA or to Gruner's employment at any point. Gruner suggests, however, that the term "regarding" in the arbitration clause is so "expansive" that it "reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se." (Reply Br. 2 (quoting *Davis v. Fenton*, 26 F. Supp. 3d 727, 740 (N.D. Ill. 2014) (Castillo, J.)).

The court has already noted its skepticism of this argument—at least as it applies to the arbitration clause in this case. It is true, as Gruner points out, that state and federal courts in Illinois have found the word "regarding," when used in an arbitration clause, to be similarly "broad" to language such as "arising from" or "related to." *See, e.g.*, *Bass v. SMG, Inc.*, 328 Ill. App. 3d 492, 498, 765 N.E.2d 1079, 1085 (1st Dist. 2002); *Davis*, 26 F. Supp. 3d at 740. But Gruner ignores the importance of the *object* of the word "regarding." The contract in *Bass*, for example, bound the parties to arbitrate "any dispute, claim or controversy between the parties regarding *this Agreement*." 328 Ill. App. 3d at 495, 765 N.E.2d at 1083 (emphasis added). It was "the Agreement" that a dispute needed to "regard" in order to be arbitrable under that contract. Similarly, in *Davis*, the contract required the parties to arbitrate "a dispute between ATTORNEY(S) and CLIENT regarding *any provision in this agreement*, *or the outcome of the matter* for which CLIENT retained ATTORNEY(S)." 26 F. Supp. 3d at 734 (emphasis added). The object of "regarding" in this contract was "any provision in this agreement, or the outcome of the matter" for which the client retained the attorney.

In Gruner's case, by contrast, the arbitration clause binds the parties to arbitrate "all disputes regarding *Net Revenue and the Earnout Amounts* (as those terms are used in Section

1.6 *of the Purchase Agreement*)." (E-mail thread of March 20, 2017 (emphasis added).) The object of "regarding" here is much more specific than the object in either *Davis* or *Bass*. Only those disputes that "regard" a single topic addressed in the Stock Purchase Agreement (i.e., "Net Revenue and the Earnout Amounts") are covered by the arbitration clause, rather than any dispute regarding any aspect of any agreement between the parties.

The Seventh Circuit has treated similar contractual language as a significant limitation on the scope of an arbitration clause. In *Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634 (7th Cir. 2002), for example, the parties had agreed to arbitrate "any" dispute "with respect to any invoice amount." *Id.* at 636. The plaintiff sued defendant, its medical transcription vendor, alleging that defendant had (1) defrauded plaintiff and breached the agreement by inflating the amount of work for which plaintiff would be billed; (2) committed constructive fraud and violated the Indiana Deceptive Consumer Sales Act by misrepresenting its counting and billing practices; and (3) breached the parties' agreement by failing to meet designated work deadlines. *Id.* at 636, 640. Defendant argued that the arbitration clause in the parties' agreement required the arbitration of all these claims, but the Seventh Circuit disagreed. "The arbitration clause here does not provide for the resolution of all controversies and claims relating to the contract," the court explained. *Id.* at 639. "[I]ndeed, it does not even provide for the resolution of all controversies and claims relating to or arising out of billing." *Id.* The only claims that were arbitrable under this clause were those alleging that defendant had improperly inflated its invoices. The district court therefore erred in requiring arbitration of plaintiff's other claims, premised on defendant's *statements* about its billing practices (rather than the bills themselves), or on defendant's alleged failure to meet deadlines. *Id.* at 640-41.

Similarly, in *Bradford-Scott Data Corp. v. Physician Computer Network*, the parties entered into a Master License Agreement that authorized the plaintiff to redistribute the defendant's computer software and required arbitration of "any payment dispute concerning license or support fees." 136 F.3d 1156, 1157 (7th Cir. 1998). Plaintiff later alleged that the

defendant breached the parties' agreement by increasing plaintiff's sales quota, by disclosing plaintiff's customer lists to unauthorized parties, by soliciting plaintiff's customers, and by "unreasonably withholding consent" to plaintiff's assignment of its rights under the agreement to a potential purchaser. *Id.* Affirming the district court, the Seventh Circuit concluded that none of these claims were arbitrable under the Master License Agreement because none were "payment dispute[s]." *Id.* at 1158.

Gruner does not even attempt to distinguish these cases in his Reply Brief, and he does not seriously argue that his claim for breach of the MSA "regard[s]" Net Revenue and Earnout Amounts. He half-heartedly suggests that it does so because Consilio's failure to employ Gruner caused Sky not to meet its revenue targets. (Reply Br. 3) But this does not make Gruner's claim for breach of the MSA one whose "origin or genesis" lies in "Net Revenue and Earnout Amounts." *Davis*, 26 F. Supp. 3d at 740. Gruner could perhaps argue that the claim for breach of the MSA has its origin or genesis in the SPA generally, as there would have been no need for Gruner to enter into the subcontractor agreement with Huron if it had not purchased Sky. But the parties did not agree to arbitrate all disputes regarding the SPA. They only agreed to arbitrate disputes "regarding Net Revenue and the Earnout Amounts."

Gruner next argues that his respective claims under the SPA and the MSA are so "inextricably intertwined" that the arbitration clause in the March 20 e-mails necessarily extends to both of them. (Reply Br. 4.) To support this argument, he points to the Seventh Circuit's decision in *Gore v. Alltel,* 666 F.3d 1027 (7th Cir. 2012), which concluded that an arbitration clause in one contract between two parties extended to claims arising from another contract between the parties that lacked an arbitration clause. But *Gore* is distinguishable from this case. *Gore* was a dispute about cellular telephone service. Although the service agreement the plaintiff customer had signed did not include an arbitration clause, a monthly invoice that the provider later sent to the customer did. The invoice warned that "by paying this bill" the customer agreed to be bound by additional terms and conditions, including one that required the

parties to arbitrate "any dispute arising out of this agreement or relating to the services and equipment." *Id.* at 1030-31. The court held that the customer's claims for breach of the original agreement, as well as his claims for fraud, civil conspiracy, and aiding and abetting, were all subject to arbitration because the nature of the defendant's allegedly unlawful conduct (i.e., providing and conspiring to provide inadequate cellular service) made the claims "dispute[s] . . . relating to the services and equipment." *Id.* at 1035-36. In short, the customer's claim for breach of the first agreement was arbitrable because its "factual allegations . . . [were] inextricably linked to the services he received," and the parties' second agreement expressly stated that disputes relating to those services were arbitrable. *Id.* at 1036.

Gruner's claim for breach of the MSA, by contrast, is completely "extricable" from "Net Revenue and the Earnout Amounts (as those terms are used in Section 1.6 of the Purchase Agreement)." Under the MSA, Huron agreed to pay Gruner $10,000 per month for a period of one year, in exchange for Gruner's "satisfactory performance" of services such as "product vision, strategy, and development," and "marketing and sales support." (Statement of Work 1-2.) Whether Huron and Gruner satisfied their respective obligations under this contract does not depend on Sky's net revenue or the amount of the earnout payments to which Sky's stockholders may or may not have been entitled. Unlike in *Gore*, where the core factual allegations supporting the plaintiff's claims related to precisely the subject matter described in the arbitration clause (that is, "services and equipment"), the core factual allegations here regard Consilio's failure to pay Gruner $10,000 per month in exchange for Gruner's satisfactory performance of the services outlined in the MSA. The arbitration clause says nothing about disputes regarding Gruner's employment. Gruner maintains that "Consilio's failure to involve Gruner in the business will help to prove that Consilio breached the Stock Purchase Agreement by failing to operate the business in a manner that would maximize the earnout consideration." (Reply Br. 4.) But this suggests only that the factual allegations in the stockholders' claim under the SPA may overlap with the allegations in Gruner's individual claim under the MSA, not that

his claim under the MSA is "inextricably linked" to an arbitrable dispute regarding net revenue or earnout payments. Whether any of the parties breached the MSA can be decided without any evidence on the subject of net revenue or earnout payments.

The court's conclusion on this issue is reinforced by a Seventh Circuit decision cited by neither party. In *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657 (7th Cir. 2002), the parties entered into two contracts: one providing for the sale of plaintiff's business to defendant, and another providing for plaintiff's continued employment by the company. Both contracts were signed on the same day, but only the employment contract included a clause directing that "any matter in dispute under or relating to this agreement . . . be finally resolved by binding arbitration." *Id.* at 660. When defendant subsequently failed to make the payments called for by the agreement to purchase the business, plaintiff sued, alleging breach of contract and fraud. Reversing an order compelling arbitration, the Seventh Circuit held that the claims were not arbitrable even though the parties signed the two contracts at the same time and even though the agreements "were both necessary . . . components of a comprehensive business transaction." *Id.* at 663. The arbitration clause in the employment contract "covers all aspects of [plaintiff]'s employment relationship," the court explained, but it did not reach issues arising out of the purchase agreement. *Id.* at 664.

Like the employment contract in *Rosenblum*, the March 20 agreement here provides no indication of the parties' intent to arbitrate claims for breach of the MSA. The fact that Gruner's claim for breach of the MSA may include similar factual allegations to his claim for breach of the SPA does not mean that the arbitration clause in the March 20 agreement necessarily extends to both. That clause extends only to what it says it does: "disputes regarding Net Revenue and the Earnout Amounts (as those terms are used in Section 1.6 of the Purchase Agreement)." As Gruner's claim for breach of the MSA can be decided without any reference whatsoever to "Net Revenue and the Earnout Amounts," that claim is not arbitrable under the March 20 agreement.

## **CONCLUSION**

Defendant has not presented clear and unmistakable evidence of the parties' intent to arbitrate arbitrability, so his Motion [10] is denied. Because there is no evidence that the parties intended to arbitrate claims for breach of the MSA, moreover, Defendant is given 21 days to show cause why this court should not stay arbitration of the claim in the second count of his Demand for Arbitration.

ENTER:

Dated: January 24, 2018

_____

REBECCA R. PALLMEYER
United States District Judge